**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **MICHAEL ROLFES,** on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| **ARBITER SPORTS, LLC,** Defendant. | |

Plaintiff Michael Rolfes ("Plaintiff"), by and through his attorneys, upon personal knowledge as to himself and his own acts and experiences, and upon information and belief as to all other matters, alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this Class Action Complaint ("Complaint") against Defendant ArbiterSports, LLC ("Defendant" or "Arbiter"), also operating as ArbiterPay or Refpay, individually and on behalf of all others similarly situated based on Defendant's failure to properly safeguard its customers' personally identifiable information ("PII"), including current and former customer's names, phone numbers, dates of birth, Social Security numbers, email addresses, street addresses and bank account information.

2.     Arbiter is a private Utah company, with a controlling interest owned by the National Collegiate Athletic Association ("NCAA"). It operates, among other services, an online scheduling and payment system for officials and referees involved in sporting events and exhibitions.

3.     Persons interested in serving as referees or officials for sporting events in high school, college, or amateur leagues register with and provide their personal information to Arbiter in order to receive assignments and payment.

4.     Arbiter collects and verifies the information and credentials for officials and transfers relevant information to leagues and sports organizations, often along with a photograph of the official. Arbiter either charges up front fees to officials or retains a portion of the fees paid to officials though its online services.

5.     Plaintiff and those similarly situated rely upon Arbiter to maintain the security and privacy of the PII entrusted to it and are essentially required to provide this information if they wish to continue working as a sports official in most events.

6.     At some time prior to July 15, 2020, Arbiter observed unauthorized access into its networks and attempts to decrypt data. On July 15, 2020, Arbiter observed concrete evidence of a data breach and subsequently paid a "ransom" to hackers who had obtained Plaintiff and class members' PII.

7.     On or about August 24, 2020, nearly six weeks after having confirmed the data breach, Arbiter began notifying governmental authorities and its customers that the PII entrusted to it had been obtained by malicious third parties and that the encrypted social security numbers and account passwords had been decrypted.

8.     To date, Arbiter does not acknowledge the breach on its website or provide information other than the single letter notifying its referee customers to be vigilant in monitoring their credit. Many of the letters Arbiter sent to members of the class actually misstate the problem, and indicate that it is the class members' child whose PII was provided to third-party bad actors.

9.      On information and belief, as a result of this massive data breach, as many as 500,000 sports officials and other users of Arbiter's services have suffered exposure of PII entrusted to Arbiter. Plaintiff and the proposed class have suffered material injuries including but not limited to the reasonable value of the PII, a diminution in the value of their protected personal information, costs and time associated with monitoring and maintaining protection over their identity, heightened risk of identity theft, and other cognizable harms.

10.     In addition, based on Defendant's actions, Plaintiff and the proposed class have received services that were and are inferior to those for which they have contracted, and have not been provided the protection and security Defendant promised when Plaintiff and the proposed class entrusted Defendant with their PII.

11.     Beyond the fact that it took Arbiter several weeks to determine that it had been hacked, it should be effectively impossible for hackers to decrypt properly encrypted PII. The confession by Arbiter that the encrypted social security numbers and password were decrypted further demonstrates inadequate security procedures and processes.

12.     Arbiter failed to disclose the extent of the data breach and notify its affected customers of the breach in a timely manner. Arbiter failed to take other reasonable steps to clearly and conspicuously inform its customers of the nature and extent of the data breach. Furthermore, by failing to provide adequate notice, Arbiter prevented Plaintiff and prospective class members from protecting themselves from the potential damages arising out of the data breach.

13.     Arbiter has violated industry best practices as an online payment facilitator and as a company that others rely upon to safeguard personal and private data.

14.     Plaintiff and the prospective class members had reasonable expectations that when they provided their valuable personal information to Arbiter, it would exercise appropriate care and could be relied upon to safeguard this data.

15.     Plaintiff and members of the proposed class have suffered actual and imminent injuries as a direct result of the data breach. The injuries suffered by Plaintiff and the proposed class as a direct result of the data breach include: (a) theft of their personal data; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate and deal with the consequences of the data breach and the stress, nuisance and annoyance of dealing with all issues resulting from the data breach; (d) the imminent injury arising from potential fraud and identity theft posed by their personal data being placed in the hands of the ill-intentioned hackers; (e) damages to and diminution in value of their personal data entrusted to Arbiter for the sole purpose of facilitating work as a sports official and with the mutual understanding that Arbiter would safeguard Plaintiff's and class members' personal data against theft and not allow access and misuse of their personal data by others; (f) the reasonable value of the PII entrusted to Arbiter; and (g) the continued risk to their personal data, which remains in the possession of Arbiter and which is subject to further breaches so long as Arbiter fails to undertake appropriate and adequate measures to protect Plaintiff's and class members' personal data in its possession.

16.     Plaintiff seeks to remedy these harms, and prevent their future occurrence, on behalf of himself and all similarly situated persons whose personal data was compromised and stolen as a result of the data breach.

17.     Accordingly, Plaintiff, on behalf of himself and other members of the class, asserts claims for breach of implied contract, negligence, bailment, and unjust enrichment, and seeks

injunctive relief, declaratory relief, monetary damages, and all other relief as authorized in equity or by law.

## THE PARTIES

18.     Plaintiff is a natural person and resident of the State of Ohio. In conducting his work as a sports referee and as an assigner, Plaintiff has maintained a personal profile on Arbiter for approximately 10 years that includes, but is not limited to, his name, residential address, email address, and social security number. For many years, Plaintiff has worked as a sports referee and officiant in Ohio, Indiana, and on a national level. He is a USA Volleyball National Referee, a USA Volleyball National Scorer, a retired National PAVO referee, a current NCAA Volleyball Referee, a volleyball referee at Northern Kentucky University and Mount St. Joseph University, assigner for Northern Kentucky University and Mount St. Joseph University for volleyball line judges and is a basketball referee for both the Ohio High School Athletic Association and the Indiana High School Athletic Association. Plaintiff associated with Arbiter in order to work as a sports official and to assign officials for certain athletics conferences, and as part of this association, Plaintiff's personal information was delivered to Arbiter for safekeeping and for certain uses necessary to effectuate the purpose of the agreement between Plaintiff and Arbiter.

19.     Plaintiff's personal data was compromised and stolen as a result of the data breach. Plaintiff was harmed by having his personal data compromised and stolen and paying more for the services provided by Arbiter than he would have had he known that it would not properly safeguard his personal information and lacked adequate security measures, as well as suffering the substantial risk of imminent additional harm from his personal data being placed in the hands of the ill-intentioned hackers, resulting in the substantially increased risk of identity theft, fraud and further misuse of his personal data, including its sale on the Internet black market.

20.    Furthermore, Plaintiff has been forced to expend time and effort to monitor his credit, check his bank statements, and modify his financial accounts.

21.    The risk to Plaintiff is continuing, and he has already utilized Credit Karma to obtain protections, such as credit freezes. Arbiter has recognized the severity of this risk by recommending that Plaintiff sign up for credit protection services, yet it only offered to cover the costs of a one-year membership to Experian's IdentityWorksSM Credit 3B service, which "helps detect possible misuse of…personal information and provides identity protection services focused on identification and resolution of identity theft." The one-year membership is insufficient because the harm and threat of imminent future harm to Plaintiff will last far longer than one year. Furthermore, Arbiter has not offered to cover other costs, such as those associated with credit locks, freezes, or other security measures.

22.    Plaintiff has suffered additional injury in the form of emotional distress. Specifically, the access to his PII by criminals due to Arbiter's lax security has caused Plaintiff anxiety.

23.    Plaintiff suffered actual injury and damages in paying money to or having money deducted from his pay by Arbiter to compensate Arbiter for services that he would not have paid for, or as much for, had Arbiter disclosed that it lacked adequate computer systems and data security practices to safeguard his personal data.

24.    Although the hackers are the direct cause of Plaintiff's injuries, the hackers were able to access Plaintiff's data only because Arbiter failed to secure the sensitive personal information entrusted to its custody. Thus, Arbiter's actions are the proximate cause of Plaintiff's injuries, and but for Arbiter's lax security, the hackers would not have been able to steal Plaintiff's PII.

25.     Plaintiff's injuries will be redressed by a favorable outcome in this litigation because he seeks compensatory damages.

26.     Arbiter has an effective monopoly on the collegiate and high school refereeing programs. Thus, Arbiter has placed itself in a position whereby if Plaintiff wants to be meaningfully employed as a sports official, he is required in practice to provide his personal information to Arbiter. However, Plaintiff and class members would not have given personal data to Arbiter had Arbiter told him that it lacked adequate computer systems and data security practices to safeguard his personal data from foreseeable acts of theft. The inability of Arbiter to provide the services of Plaintiff and the class members to the organizations that contract with it to provide sports officials would have substantially harmed Arbiter's business, meaning that Arbiter stood to gain by concealing its inadequate security practices and data security measures.

27.     Defendant Arbiter is organized under the laws of the State of Utah with its corporate headquarters located at 235 West Sego Lily Drive in Sandy, Utah and on information and belief operates in all 50 U.S. States as well as Canada.

## JURISDICTION & VENUE

28.     This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 putative class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Plaintiff (and many members of the class) and Defendant are citizens of different states.

29.     This Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Complaint took place in this District, Defendant caused Plaintiff tortious injury in Ohio and has transacted business in Ohio, and derived substantial benefit and revenue that caused tortious injury. Defendant must reasonably anticipate being haled into Court

in Ohio and the Court's exercise of personal jurisdiction over Defendant does not offend traditional notions of fair play and substantial justice.

30.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District, and Defendant conducts substantial business in this District.

## **FACTUAL ALLEGATIONS**

31.     Arbiter and/or its predecessors have been involved in the business of creating and providing systems to assign sports officials for amateur and scholastic sporting events for many years. The original Arbiter system was created in 1984 and in 2008 Arbiter was acquired by the NCAA. Arbiter is the foremost service for scheduling and paying sports officials and referees.

32.     Arbiter provides a platform to be used by those responsible for assigning officials to sporting events and to schedule, contact, verify credentials, and ultimately, to pay officials.

33.     Arbiter acquires the personal information of officials, such as Plaintiff and the members of the class, in order to provide its services. Required information includes first and last name, date of birth, Social Security Number ("SSN") or Tax Identification Number ("TIN"), business name (only applicable if entering a TIN), phone numbers, physical address, mailing address and email address. Profiles generally include photographs of the officials as well.

34.     In requiring the official to provide a social security number, Arbiter states that "the number can only be viewed by a paying administrator, and only the last four digits are visible by default (with exception to printing payment vouchers)."[1]

35.     Arbiter's services are divided into several categories, including ArbiterPay for payments, ArbiterGame for scheduling, ArbiterAthlete for pre-participation registration,

---

[1] *See* https://arbitersports.force.com/officials/s/article/Updating-Your-Profile-in-ArbiterOne.

ArbiterOne for assigning officials to events, ArbiterWorks for training and eligibility, and ArbiterMobile for communications.

36.     Arbiter's website devotes a section to describing to officials such as Plaintiff and the class members what ArbiterOne offers.

> Chances are you already use ArbiterSports product
>
> Because ArbiterOne is the easiest and most efficient way to assign officials and coordinate with other assigners, leagues and teams, most officials receive their assignments from this industry-leading product. ArbiterOne gives you a complete view of all your game schedules and game locations. You'll also receive frequent, organized communication by email on upcoming games. [2]

37.     Plaintiff and class members can and did link their Arbiter accounts with their bank accounts to facilitate payment for officiating jobs obtained through Arbiter using ArbiterPay.

38.     According to the Arbiter website:

> ArbiterSports allows for easy assignment of officials through ArbiterOne and convenient payment of officials through ArbiterPay. Additionally, ArbiterPay takes care of state and federal tax reporting. These solutions will keep you, your bookkeeper and your officials happy all year long. From elite college conferences to local recreation departments, ArbiterPay processes and sends more than $50 million each year in officiating payments. Our solutions will make payday a time to look forward to.[3]

39.     Arbiter's "privacy policy" found on its website states that "Protecting your privacy and your information is a priority at ArbiterSports....We use industry standard methods to protect your personally identifying information from unauthorized access."[4] But this is not true: it is not industry standard to use minimal encryption on sensitive information such as passwords and access to PII that Arbiter admits it only "usually store[s]" "on a computer behind a 'firewall' in a secure

---

[2] https://www.arbitersports.com/arbiterpay/.
[3] Id.
[4] http://www.arbitersports.com/privacy-policy/

location."[5] As detailed below, it is not industry standard to quietly seek to pay off bad actors demanding a ransom, with no method of confirming that data being ransomed is destroyed or returned. And it is not industry standard to refuse to notify the half a million victims of Arbiter's failure to provide minimal protection.

40.     Moreover, Arbiter for years has known the risks to which it was exposing Plaintiff and the class members. Over four years ago, in August 2016, Arbiter posted on its blog a short webpage titled "A Safer Solution for Officiating Payments." A copy of that post has been attached to the Complaint as **Exhibit A**. In it, Arbiter sells the fear of leaving a W-9 in the gym after officiating a game:

> Imagine officiating a game and turning in a W-9 form while you are in the gym, only to find that same document, with all of your personal information, sitting alone later on a table. It contains your home address and social security number—all up for grabs for anyone at the event. This situation is not uncommon and can cause problems for the official, as well as liability issues for the athletic organization or school.

41.     The solution to lax security Defendant advertises is itself:

**The Safer Bet for Officials**

> Identity theft is something that we have to consider nowadays. Most of us take precautions in shredding our mail and keeping our information private. Unfortunately, when a school isn't using an electronic sports officials payment system, it creates vulnerabilities and opens the door to identity theft. Many schools do not have proper training on how to keep important documents, such as W-9 forms, safe and secure. You will see these documents out in the open, like the scenario described above, or loose in someone's desk. ArbiterPay™ fixes this problem, as it allows for electronic documents and payments that are kept in a secure environment. As an official, you don't need to worry about your private information getting lost or ending up in the wrong hands.

**The Safer Bet for Schools**

---

[5] *Id.*

10

Schools do not intentionally mishandle officials' documents, but without the proper training and monitoring, there is a disaster waiting to happen. With ArbiterPay, schools can reduce their liability when it comes to sensitive information. Plus, using an electronic system to handle payments, and even 1099s, can reduce workload and is generally cheaper than manual processing. It eliminates vouchers, check processing and postage.

How safe is ArbiterPay? All funds are FDIC-insured. The money is placed in a pooled escrow account at an unaffiliated FDIC-insured trust bank or savings institution. The ArbiterPay platform is secure and easy to access. Plus, federal and state compliance is built right into the system.

42.     Arbiter also recognized one of the top five questions officials might have about its program is the question "Is the platform secure?". Arbiter answers affirmatively:

Security and privacy are commonly a concern for individuals and organizations and for good reason. When you are providing sensitive information, you want to make sure it is protected. We have gone to great lengths to ensure that all parties are protected when using ArbiterPay. Our website is secured by 256-bit encryption and GeoTrust and our privacy policy has been certified by TRUSTe.[6]

43.     Despite its awareness and its public commitments, Arbiter did not take the necessary and required minimal steps to secure Plaintiff's and the class members' PII.

44.     On or about August 24, 2020, and only in conjunction with letters sent to the attorneys general of states where such notification is required, Arbiter informed Plaintiff and members of the class by letter that it had "detected unauthorized access to certain devices in our network." Arbiter informed members of the class that approximately six weeks earlier their PII had been obtained by hackers who claimed to have erased the information upon payment of a ransom

On July 15, 2020, findings from the investigation identified a backup copy of a database made for business continuity reasons that was obtained by the unauthorized party at some point in the prior few weeks. Although we were able to prevent devices from being encrypted, the unauthorized party demanded payment

---

[6] https://www.arbitersports.com/top-5-questions-about-arbiterpay/

in exchange for deleting the files that were obtained. We reached an agreement and obtained confirmation that the unauthorized party deleted the files.

45.     Arbiter's disclosure letter described the information taken and the resources from which the class members' PII was obtained.

The database file involved supports ArbiterGame, ArbiterOne, and ArbiterWorks and contained information about our users, including account username and password, name, address, date of birth, email address, and Social Security number. The passwords and Social Security numbers were encrypted in the file, but the unauthorized party was able to decrypt the data.

### *Arbiter Owed a Duty to Plaintiff and Class Members to Adequately Safeguard Their PII and to Provide Timely Notice of the Breach of its Systems*

46.     Arbiter knows the importance of security in maintaining personal information, and the value its users place on keeping their PII secure.

47.     Arbiter owes a duty to Plaintiff and the class members to maintain adequate security and to protect the confidentiality of their personal data.

48.     Arbiter owes a further duty to its current and former users to immediately and accurately notify them of a breach of its systems to protect them from identify theft and other misuse of their personal data.

49.     While Arbiter claims to have encrypted PII, competently encrypted data, particularly considering the sensitive nature of the data entrusted to Arbiter, should not have been susceptible to decryption. On information and belief, Arbiter did not use industry-standard encryption methods to secure Plaintiff's and the class's PII.

50.     On information and belief, there have been complaints about Arbiter's commitment to data security in the past. For instance, Arbiter previously would simply email passwords to users for password changes, which is a completely insecure method of transmitting such information.

*The Sort of PII at Issue Here is Particularly Valuable to Hackers*

51.     Businesses that store personal information are likely to be targeted by cyber criminals. Credit card and bank account numbers are tempting targets for hackers. However, information such as dates of birth and Social Security numbers are even more attractive to hackers; they are not easily destroyed and can be easily used to perpetrate identify theft and other types of frauds.

52.     The unauthorized disclosure of Social Security numbers can be particularly damaging, because Social Security numbers cannot easily be replaced. In order to obtain a new number a person must prove, among other things, that he or she continues to be disadvantaged by the misuse. Thus, no new number can be obtained until the damage has been done.

53.     Furthermore, as the Social Security Administration ("SSA") warns:

Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[7]

54.     Here, the unauthorized access by the hackers left them with the tools to perform the most thorough identity theft—they have obtained all the essential PII to mimic the identity of the

---

[7] SSA, Identity Theft and Your Social Security Number, SSA Publication No. 05-10064 (Dec. 2013)*, available at* http://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Nov. 13, 2020).

user, including for Plaintiff and the majority of class members, an official identification photo. The personal data of Plaintiff and class members stolen in the Arbiter Security Breach constitutes a dream for hackers and a nightmare for Plaintiff and the class. Plaintiff's and class members' stolen personal data represents essentially one-stop shopping for identity thieves.

55. According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to resolve.[8] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank and finance fraud.[9]

56. A person whose personal information has been compromised may not see any signs of identity theft for *years*. According to the GAO Report

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[10]

57. Companies recognize that Personal Information is a valuable asset. Indeed, Arbiter paid a ransom simply for the prayer of a promise that PII held by Plaintiff and the class members would be deleted.

---

[8] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (2012), http://www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf (last visited Nov. 13, 2020).

[9] *Id.* The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

[10] *See* http://www.gao.gov/new.items/d07737.pdf at 29 (last visited Nov. 13, 2020).

58.     Personal Information is a valuable commodity. A "cyber black-market" exists in which criminals openly post stolen credit card numbers, Social Security numbers, and other personally identifiable information on a number of Internet websites. Plaintiff's and class members' personal data stolen has a high value on both legitimate and black markets.

59.     At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information as follows:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[11]

60.     Consumers place a high value not only on their PII, but also on the privacy of that data. Researchers have already begun to shed light on how much consumers value their data privacy – and the amount is considerable.

61.     Notably, one study on website privacy determined that U.S. consumers valued the restriction of improper access to their personal information – the very injury at issue here – between $11.33 and $16.58 per website. The study also determined that "[a]mong U.S. subjects, protection against errors, improper access, and secondary use of personal information is worth US$30.49 – 44.62."[12] This study was done in 2002, almost twenty years ago. The sea-change in how pervasive the Internet is in every day lives since then indicates that these values–when associated with the loss of PII to bad actors–would be much higher today.

---

[11] FEDERAL TRADE COMMISSION, *The Information Marketplace: Merging and Exchanging Consumer Data*, *transcript available* at http://www.ftc.gov/news-events/events-calendar/2001/03/information-marketplace-merging-exchanging-consumer-data (last visited Nov. 13, 2020).

[12] Hann, Hui, *et al*, The Value of Online Information Privacy: Evidence from the USA and Singapore, at 17. Oct. 2002, *available at* https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Nov. 13, 2020).

62.     Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent refund. The United States government and privacy experts acknowledge that it may take years for identity theft to come to light and be detected.

63.     As noted above, the disclosure of Social Security numbers in particular poses a significant risk. Criminals can, for example, use Social Security numbers to create false bank accounts or file fraudulent tax returns. Former and current users of Arbiter systems whose Social Security numbers have been compromised will and already have spent time contacting various agencies, such as the Internal Revenue Service and the Social Security Administration. They also now face a real and imminent substantial risk of identity theft and other problems associated with the disclosure of their Social Security number, and will need to monitor their credit and tax filings for an indefinite duration.

64.     Again, because the information Arbiter allowed to be compromised and taken is of such a durable and near-permanent quality, the harms to Plaintiff and the class will continue to grow, and Plaintiff and the class will continue to be at substantial risk for further harm.

***Arbiter's post-breach activity was inadequate***

65.     Personal and financial information can be sold on the black-market almost immediately. As Illinois Attorney General Lisa Madigan aptly put it, "the second somebody gets your credit or debit card information, it can be a matter of hours or days until it's sold on the black market and someone's starting to make unauthorized transactions."[13] Thus, the compromised

---

[13]   Phil Rosenthal, *Just assume your credit and debit card data were hacked*, http://www.chicagotribune.com/business/columnists/ct-data-breach-credit-scam-rosenthal-1001-biz-20140930-column.html#page=1 (last visited Nov. 13, 2020).

information could be used weeks prior to the receipt of any letter from Arbiter and Arbiter's proposed solutions to the potential fraud are, therefore, woefully deficient.

66.     Immediate notice of a security breach is essential to protect people such as Plaintiff and the class members. Arbiter failed to provide such immediate notice, in fact taking at least five or six weeks to disclose that there had been a breach, thus further exacerbating the damages sustained by Plaintiff and the class resulting from the breach.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings all claims as class claims under Federal Rule of Civil Procedure 23. The requirements of Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) are met with respect to the class defined below.

68.     Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action as a national class action for himself and all members of the following class of similarly situated persons:

### The Nationwide Class

All persons who reside in the United States whose personal data was compromised as a result of the security breach first disclosed by Arbiter on August 24, 2020.

69.      Excluded from the class are Defendant; officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant; and the affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assigns of Defendant. Also excluded are the judges and court personnel in this case and any members of their immediate families.

70.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

71.      All members of the proposed class are readily ascertainable in that Arbiter has access to addresses and other contact information for all members of the class, which can be used for providing notice to class members.

72.      ***Numerosity***. The class is so numerous that joinder of all members is impracticable. The class includes as many as 540,000 individuals whose personal data was compromised by the Arbiter Security Breach.

73.      ***Commonality***. There are numerous questions of law and fact common to Plaintiff and the class, including the following:

- whether Arbiter engaged in the wrongful conduct alleged in this Complaint;

- whether Arbiter's conduct was unlawful;

- whether Arbiter failed to implement and maintain reasonable systems and security procedures and practices to protect customers' personal data;

- whether Arbiter unreasonably delayed in notifying affected customers of the Security Breach;

- whether Arbiter owed a duty to Plaintiff and members of the class to adequately protect their personal data and to provide timely and accurate notice of the Arbiter Security Breach to Plaintiff and members of the class;

- whether Arbiter breached its duties to protect the personal data of Plaintiff and members of the class by failing to provide adequate data security and failing to provide timely and adequate notice of the Arbiter Security Breach to Plaintiff and the class;

- whether Arbiter's conduct was negligent;

- whether Arbiter knew or should have known that its computer systems were vulnerable to attack;

- whether Arbiter's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of class members' personal data;

- whether Arbiter unlawfully failed to inform Plaintiff and members of the class that it did not maintain computers and security practices adequate to reasonably safeguard customers' financial and personal data;

- whether Arbiter should have notified the public, Plaintiff, and class members immediately after it learned of the Security Breach;

- whether Plaintiff and members of the class suffered injury, including ascertainable losses, as a result of Arbiter's conduct (or failure to act);

- whether Arbiter breached its duties to Plaintiff and the class as a bailee of PII entrusted to it and for which Arbiter owed a duty to safeguard and of safekeeping;

- whether Plaintiff and members of the class are entitled to recover damages;

- whether Plaintiff and class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or other equitable relief.

74.    *Typicality*. Plaintiff's claims are typical of the claims of the class in that Plaintiff, like all class members, had his personal data compromised, breached and stolen in the Arbiter Security Breach. Plaintiff and all class members were injured through the uniform misconduct of Arbiter described in this Complaint and assert the same claims for relief.

75.    Plaintiff and counsel will fairly and adequately protect the interests of the class. Plaintiff has retained counsel who are experienced in class action and complex litigation. Plaintiff has no interests that are antagonistic to, or in conflict with, the interests of other members of the class.

76.    The questions of law and fact common to class members predominate over any questions which may affect only individual members.

77.    *Superiority*. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Moreover, absent a class action, most class members would find the cost of litigating their claims prohibitively high and would therefore have no effective remedy, so that in the absence of class treatment, Arbiter's violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the class. Plaintiff and class members have been harmed by Arbiter's wrongful conduct and/or

action. Litigating this action as a class action will reduce the possibility of repetitious litigation relating to Arbiter's conduct and/or inaction. Plaintiff knows of no difficulties that would be encountered in this litigation that would preclude its maintenance as a class action.

78.     Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3), because the above common questions of law or fact predominate over any questions affecting individual members of the class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

79.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A), in that the prosecution of separate actions by the individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Arbiter. In contrast, the conduct of this action as a class action conserves judicial resources and the parties' resources and protects the rights of each class member.

## COUNT I — NEGLIGENCE

80.     Plaintiff incorporates by reference those paragraphs set out above as if fully set forth here.

81.     Arbiter owed a duty to Plaintiff and members of the class to safeguard the sensitive PII that they were obligated to provide Arbiter as a condition of receiving Arbiter's services. Arbiter was required to prevent foreseeable harm to Plaintiff and the class members, and therefore had a duty to take reasonable steps to safeguard sensitive PII from unauthorized release or theft.

82.     In other words, Arbiter was required to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting their personal and financial information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized

persons. This duty included, among other things, designing, maintaining, and testing Arbiter's security systems to ensure that Plaintiff's and class members' personal and financial information in Arbiter's possession was adequately secured and protected.

83.     Arbiter further owed a duty to Plaintiff and class members to implement processes that would detect a breach of its security system in a timely manner and to timely act upon warnings and alerts.

84.     There is a very close connection between Arbiter's failure to follow reasonable security standards to protect its current and former users' personal data and the injury to Plaintiff and the class. When individuals have their personal information stolen, they are at substantial risk for imminent identity theft, and need to take steps to protect themselves, including, for example, buying credit monitoring services and purchasing or obtaining credit reports to protect themselves from identity theft.

85.     If Arbiter had taken reasonable security measures, data thieves would not have been able to take the personal information of as many as 500,000 current and former users of Arbiter's services. The policy of preventing future harm weighs in favor of finding a special relationship between Arbiter and Plaintiff and the class. If companies are not held accountable for failing to take reasonable security measures to protect their customers' personal data, they will not take the steps that are necessary to protect against future security breaches.

86.     Arbiter owed a duty to timely disclose the material fact that Arbiter's computer systems and data security practices were inadequate to safeguard users' personal and financial data from theft.

87.     Arbiter breached these duties by the conduct alleged in the Complaint by, including without limitation, failing to protect its customers' personal and financial, information; failing to

maintain adequate computer systems and data security practices to safeguard customers' personal and financial information; failing to disclose the material fact that Arbiter's computer systems and data security practices were inadequate to safeguard customers' personal and financial data from theft; and failing to disclose in a timely and accurate manner to Plaintiff and members of the class the material fact of the data breach.

88.     As a direct and proximate result of Arbiter's failure to exercise reasonable care and use commercially reasonable security measures, the personal data of current and former Arbiter users was accessed by ill-intentioned criminals who could use the information to commit identity fraud or debit and credit card fraud. Plaintiff and the class face the imminent, certainly impending and substantially heightened risk of identity theft, fraud and further misuse of their personal data.

89.     As a proximate result of this conduct, Plaintiff and the other class members suffered damage as a result of efforts to safeguard their information after the unauthorized data release through committing time and resources to monitor their credit and financial accounts, and will continue to suffer damages in an amount to be proven at trial. Furthermore, Plaintiff and the class have suffered emotional distress as a result of the breach and have lost time and/or money as a result of past and continued efforts to protect their PII and prevent the unauthorized use of their PII.

## COUNT II — BAILMENT

90.     Plaintiff incorporates by reference those paragraphs set out above as if fully set forth here.

91.     Plaintiff and the class delivered their personal and financial information to Arbiter for the exclusive purpose of obtaining services to facilitate working as sports and event officials.

92.     The PII is intangible personal property belonging to Plaintiff and the class members.

93.     In delivering their personal data to Arbiter, Plaintiff and class members intended and understood that Arbiter would adequately safeguard their personal data.

94.     Arbiter accepted possession of Plaintiff's and class members' personal data for the purpose of providing work-related services to Plaintiff and class members.

95.     By accepting possession of Plaintiff's and class members' personal data, Arbiter understood that Plaintiff and class members expected Arbiter to adequately safeguard their personal data. Accordingly, a bailment (or deposit) was established for the mutual benefit of the parties.

96.     Arbiter's privacy policy stated that, upon request, it would "delete the data" obtained from Plaintiff and the class members "if ArbiterSports is not required to retain it by law or for legitimate business purposes." Similarly, the privacy policy went on to state that Arbiter "may retain your personal information for the period necessary to fulfill the purposes outlined in this Privacy Policy unless a longer retention period is required or permitted by law." These provisions in the Privacy Policy demonstrate that there was an implied agreement that the PII would be returned, deleted, or accounted for when the relationship between Arbiter and Plaintiff and the class ceased to exist.

97.     During the bailment (or deposit), Arbiter owed a duty to Plaintiff and class members to exercise reasonable care, diligence, and prudence in protecting their personal data as well as a duty to safeguard personal information properly and maintain reasonable security procedures and practices to protect such information. Defendant breached this duty.

98.     Arbiter breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiff's and class members' personal and financial information, resulting in the unlawful and unauthorized access to and misuse of Plaintiff and class members' personal and financial information.

99.     As a proximate result of this conduct, Plaintiff and the other class members suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT III — BREACH OF IMPLIED CONTRACT

100.    Plaintiff incorporates by reference those paragraphs set out above as if fully set forth here.

101.    Plaintiff and the class delivered their personal and financial information to Arbiter as part of the process of obtaining work and payment as either an official or event worker.

102.    Plaintiff and members of the class entered into implied contracts with Arbiter pursuant to which Arbiter agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and class members that their data had been breached and compromised.

103.    In providing such data, Plaintiff and the other members of the class entered into an implied contract with Arbiter whereby Arbiter became obligated to reasonably safeguard Plaintiff's and the other class members' sensitive, non-public information.

104.    In delivering their personal data to Arbiter, Plaintiff and class members intended and understood that Arbiter would adequately safeguard their personal data.

105.    Plaintiff and the class members would not have entrusted their private and confidential financial and personal information to Defendants in the absence of such an implied contract.

106. Arbiter accepted possession of Plaintiff's and class members' personal data for the purpose of providing services to Plaintiff and class members.

107. Plaintiff and members of the class believed that Arbiter would maintain their personal data in a reasonably secure manner and provided their personal data to Arbiter on that basis for the purpose of obtaining work and payment as an official or as an event worker.

108. Had Arbiter disclosed to Plaintiff and members of the class that Arbiter did not have adequate computer systems and security practices to secure users' and former users' personal data, Plaintiff and members of the class would not have provided their PII to Arbiter.

109. Arbiter recognized that its users' and former users' personal data is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and members of the class.

110. Plaintiff and members of the class fully performed their obligations under the implied contracts with Arbiter.

111. Arbiter breached the implied contract with Plaintiff and the other members of the class by failing to take reasonable measures to safeguard their data.

112. As a proximate result of this conduct, Plaintiff and the other class members suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT IV — UNJUST ENRICHMENT

113. Plaintiff incorporates by reference those paragraphs set out above as if fully set forth herein.

114. Plaintiff and class members conferred a monetary benefit on Arbiter in the form of monies or fees paid for services from Arbiter. Arbiter had knowledge of this benefit when it accepted the money from Plaintiff and the class members.

115. The monies or fees paid by the Plaintiff and class members were supposed to be used by Arbiter, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiff and class members.

116. Arbiter failed to provide reasonable security, safeguards, and protections to the personal data of Plaintiff and class members, and as a result the Plaintiff and class overpaid Arbiter as part of services they purchased.

117. Arbiter failed to disclose to Plaintiff and members of the class that its computer systems and security practices were inadequate to safeguard users' and former users' personal data against theft.

118. Under principles of equity and good conscience, Arbiter should not be permitted to retain the money belonging to Plaintiff and class members because Arbiter failed to provide adequate safeguards and security measures to protect Plaintiff's and class members' personal and financial information that they paid for but did not receive.

119. Arbiter wrongfully accepted and retained these benefits to the detriment of Plaintiff and class members.

120. Arbiter's enrichment at the expense of Plaintiff and class members is and was unjust.

121. As a result of Arbiter's wrongful conduct, as alleged above, Plaintiff and the class are entitled under the unjust enrichment laws of all 50 states to restitution and disgorgement of all profits, benefits, and other compensation obtained by Arbiter, plus attorneys' fees, costs, and interest thereon.

**RELIEF REQUESTED**

Plaintiff, individually and on behalf of the proposed class, requests that the Court:

1. Certify this case as a class action on behalf of the class defined above, appoint Plaintiff as class representative, and appoint the undersigned counsel as class counsel;

2. Award declaratory, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and other class members;

3. Award restitution and damages to Plaintiff and class members in an amount to be determined at trial;

4. Award Plaintiff and class members their reasonable litigation expenses and attorneys' fees to the extent allowed by law;

5. Award Plaintiff and class members pre- and post-judgment interest, to the extent allowable; and

6. Award such other and further relief as equity and justice may require.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Respectfully submitted,

*/s/ Terence R. Coates*
W.B. Markovits (0018514)
Terence R. Coates (0085579)
Zachary C Schaengold (0090953)
Dylan J. Gould (0097954)
MARKOVITS, STOCK & DEMARCO, LLC
3825 Edwards Road, Suite 650
Cincinnati, OH 45209
Phone: (513) 651-3700
Fax: (513) 665-0219
*bmarkovits@msdlegal.com*
*tcoates@msdlegal.com*
*zschaengold@msdlegal.com*
*dgould@msdlegal.com*

*Counsel for Plaintiff, the Class, and the Subclass*